UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Derryl Higdon, as Personal Representative of the Estate of Robert Higdon, | ) ) ) | Case No.: |
| Plaintiff, | ) ) ) | (Greenwood Co. C/A. No. 2022-CP-24-00991) |
| v. | ) ) | **NOTICE OF REMOVAL** |
| NHC HealthCare/Greenwood, LLC and Jacob Shearer, | ) ) ) | |
| Defendants. | ) ) ) | |

Defendants NHC HealthCare/Greenwood, LLC and Jacob Shearer (collectively, "Defendants") hereby remove the above-captioned matter from the Circuit Court of the State of South Carolina for Greenwood County to the United States District Court for the District of South Carolina, Greenwood Division pursuant to 28 U.S.C. §§ 1331, 1332 (applying the fraudulent joinder doctrine), 1441, 1442, & 1446, and Local Rule 83.IV.02, reserve all defenses to venue based on 42 U.S.C. §§ 247d-6d, 247d-6e, and reserve the right to seek enforcement of an arbitration agreement governing the dispute.

## **PROCEDURAL BACKGROUND**

1.      Derryl Higdon, as Personal Representative of the Estate of Robert Higdon ("Plaintiff") file a Notice of Intent to File Suit in the Circuit Court for the State of South Carolina for Greenwood County on November 3, 2021 against only Defendant NHC HealthCare/Greenwood, LLC.

2.      Defendant NHC HealthCare/Greenwood, LLC timely removed the matter to the United States District Court for the District of South Carolina on December 17, 2021.

3.      The United States District Court for the District of South Carolina granted

Plaintiff's Motion to Dismiss on May 10, 2022.

4.    Plaintiff filed his Amended Notice of Intent to File Suit in the Circuit Court for the State of South Carolina for Greenwood County on August 16, 2022, naming Defendant Jacob Shearer for the first time.

5.    The parties participated in mandatory pre-suit mediation on October 5, 2022, which ended in an impasse.

6.    Plaintiff filed his Summons and Complaint in the Circuit Court for the State of South Carolina for Greenwood County on October 17, 2022.

7.    Defendant NHC HealthCare/Greenwood, LLC was served with the Summons and Complaint (Exhibits A & B) on November 2, 2022.

8.    Defendant Jacob Shearer was served with the Summons and Complaint (Exhibits A & B) on November 16, 2022.

9.    Defendants are timely filing this Notice of Removal within thirty days of service of process as required by 28 U.S.C. § 1446(b).

10.    This Court should exercise original jurisdiction over this action under 28 U.S.C. § 1332 despite the lack of complete diversity of citizenship between the parties, because the Court should apply the fraudulent joinder doctrine and because and the amount in controversy exceeds $75,000, exclusive of interest and costs, based on the nature of the claims/causes of action (Survival Action claiming damages for physical pain, suffering, mental anguish, emotional distress, impairment of bodily efficiency, and medical expenses, and Wrongful Death claiming damages for grief, shock, sorrow, wounded feelings, loss of companionship, loss of counsel on family matter, emotional distress, funeral expenses, and loss of financial support).

11.    This Court has original jurisdiction over this action under 28 U.S.C. § 1331 because

any and all State law claims are completely preempted by the Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U.S.C. §§ 247d-6d, 247d-6e and, thus, Plaintiff's claims arise under Federal law.

12.     This Court has original jurisdiction over this action under 28 U.S.C. § 1442(a)(1) as Defendants were acting under color of and/or at the direction of the United States Government and/or a United States Officer with respect to, and without limitation, Centers for Medicare & Medicaid Services ("CMS"), Centers for Disease Control and Prevention ("CDC"), United States Department of Homeland Security, Cybersecurity & Infrastructure Agency ("DHS"), United States Department of Health and Human Services ("HHS"), the PREP Act, Declarations issued by the HHS Secretary pursuant to the PREP Act,[1] HHS General Counsel Advisory Opinions,[2] and

---

[1] 85 Fed. Reg. 15198 ("Initial Declaration"), 85 Fed. Reg. 21012 ("First Amended Declaration"), 85 Fed. Reg. 35100 ("Second Amended Declaration"), 85 Fed. Reg. 52136 ("Third Amended Declaration"), 85 Fed. Reg. 79190 ("Fourth Amended Declaration"), 86 Fed. Reg. 7872 ("Fifth Amended Declaration"), 86 Fed. Reg. 9516 ("Sixth Amended Declaration"), 86 Fed. Reg. 10588 ("Technical Correction to Fifth and Sixth Amended Declarations"), 86 Fed. Reg. 14462 ("Seventh Amended Declaration"), 86 Fed. Reg 41977 ("Eighth Amended Declaration"), 86 Fed. Reg. 51160 ("Ninth Amended Declaration"), 86 Fed. Reg. 54696 ("Technical Corrections to Ninth Amended Declaration"), and 87 Fed. Reg. 982 ("Tenth Amended Declaration").

Collectively "Declarations."

[2] <u>Advisory Opinion on the Public Readiness and Emergency Preparedness Act and the March 10, 2020 Declaration under the Act</u>, Department of Health and Human Services (Apr. 17, 2020, as modified on May 19, 2020), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/prep-act-advisory-opinion-hhs-ogc.pdf.
("First HHS Advisory Opinion").

<u>Advisory Opinion 20-02 on the Public Readiness and Emergency Preparedness Act and the Secretary's Declaration under the Act</u>, Department of Health and Human Services, (May 19, 2020), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/advisory-opinion-20-02-hhs-ogc-prep-act.pdf.
("Second HHS Advisory Opinion").

<u>Advisory Opinion 20-03 on the Public Readiness and Emergency Preparedness Act and the Secretary's Declaration under the Act</u>, Department of Health and Human Services (Oct. 22,

the Statement of Interest of the United States.[3]

13.    Attached to this Notice of Removal are the following exhibits pursuant to 28 U.S.C.

§ 1446(a) and Local Rule 83.IV.01:

| EXHIBIT | DATE OF FILING | DESCRIPTION |
|---|---|---|
| A | October 17, 2022 | Summons |
| B | October 17, 2022 | Complaint |
| C | October 17, 2022 | Affidavit of Kristin Oeder |
| D | November 9, 2022 | Proof of Service – NHC HealthCare/Greenwood, LLC (November 2, 2022) |
| E | N/A[4] | Proof of Service – Jacob Shearer |

2020, as modified on Oct. 23, 2020), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/AO3.1.2_Updated_FINAL_SIGNED_10.23.20.pdf.
("Third HHS Advisory Opinion").

Advisory Opinion 20-04 on the Public Readiness and Emergency Preparedness Act and the Secretary's Declaration under the Act, Department of Health and Human Services (Oct. 22, 2020, as modified on Oct. 23, 2020), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/AO3.1.2_Updated_FINAL_SIGNED_10.23.20.pdf.
("Fourth HHS Advisory Opinion").

Advisory Opinion 21-01 on the Public Readiness and Emergency Preparedness Act and the Secretary's Declaration under the Act, Department of Health and Human Services, (Jan. 8, 2021), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2101081078-jo-advisory-opinion-prep-act-complete-preemption-01-08-2021-final-hhs-web.pdf.
("Fifth HHS Advisory Opinion").

Advisory Opinion 21-02 on the Public Readiness and Emergency Preparedness Act and the Secretary's Declaration under the Act, Department of Health and Human Services, (Jan. 12, 2021) https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/AO-21-02-PREP-Act_1-12-2021_FINAL_SIGNED.pdf
("Sixth HHS Advisory Opinion").

Collectively "HHS Advisory Opinions."

[3] *Bolton v. Gallatin Ctr. for Rehab. & Healing, LLC*, No. 3:20-cv-00683, Statement of Interest of the United States (filed Jan. 19, 2021).

[4] Defendant Jacob Shearer was served with the Summons and Complaint on November 16, 2022. The Proof of Service has not yet been filed, but Defendants will supplement this exhibit upon its filing.

| F | November 22, 2022[5] | Defendants' Notice of Filing Removal |

14.     There have been no orders issued in State court.

15.     Removal to this venue is proper because Greenwood County, South Carolina lies within the jurisdictional boundaries of the United States District Court for the District of South Carolina, Greenwood Division.

## NATURE OF THE CASE and ALLEGATIONS

16.     Robert Higdon ("Decedent") was admitted to NHC Greenwood on June 14, 2017, and continued to reside at NHC Greenwood during the COVID-19 pandemic.

17.     Plaintiff's Complaint alleges that at the times relevant to this action, the Centers for Disease Control ("CDC") was issuing guidelines to rehabilitation and skilled nursing facilities pertaining to the prevention of the spread of COVID-19, including guidelines prohibiting COVID-19 positive employees from working with or caring for immunocompromised patients.

18.     Plaintiff alleges Decedent was immunocompromised and that Defendants knew or should have known what CDC guidelines to follow, but that Decedent was exposed to COVID-19 by a member of Defendants' staff who Defendants knew or should have known was COVID-19 positive.

19.     Plaintiff alleges that due to the COVID-19 exposure, Decedent went into respiratory failure and died on August 30, 2020.

20.     Plaintiff alleges Defendants were grossly negligent in knowingly allowing COVID-19 positive employees to work with and care for Decedent, who Plaintiff contends was immunocompromised.

---

[5] This is the anticipated filing date, but actual filing date is subject to the return of the filed Federal Notice of Removal documents.

## BASIS FOR APPLICATION OF THE FRAUDULENT JOINDER DOCTRINE AND 28
## U.S.C. §1332 JURISDICTION

21.     Although Defendants deny Plaintiff is entitled to any relief whatsoever, Defendants believe, in good faith, that the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees based on the allegations of the Complaint and the causes of action listed therein (Survival Action claiming damages for physical pain, suffering, mental anguish, emotional distress, impairment of bodily efficiency, and medical expenses, and Wrongful Death claiming damages for grief, shock, sorrow, wounded feelings, loss of companionship, loss of counsel on family matter, emotional distress, funeral expenses, and loss of financial support).

22.     Upon information and belief, and as alleged by Plaintiff in the Complaint, Plaintiff is a resident, citizen, and domiciliary of the State of South Carolina.

23.     Defendant NHC HealthCare/Greenwood, LLC is a limited liability company ("LLC") organized and existing pursuant to the laws of the State of South Carolina.  Defendant NHC HealthCare/Greenwood, LLC's sole member is NHC/OP, L.P., which is a limited partnership organized and existing pursuant to the laws of the State of Delaware.  The limited partners of NHC/OP, L.P. are NHC/Delaware, Inc. and National HealthCare Corporation.

24.     NHC/Delaware, Inc., is organized and existing pursuant to the laws of the State of Delaware with its corporate office and principal place of business in the State of Tennessee.  Thus, NHC/Delaware, Inc. is a citizen of the States of Delaware and Tennessee.

25.     National HealthCare Corporation is organized and existing pursuant to the laws of the State of Delaware with its corporate office and principal place of business in the State of Tennessee.  Thus, National HealthCare Corporation is a citizen of the States of Delaware and Tennessee.

26.    Defendant Jacob Shearer is a resident, citizen, and domiciliary of the State of South Carolina.

27.    Although complete diversity does not exist between Plaintiff and Defendants, Defendants request the Court apply the fraudulent joinder doctrine to disregard, for jurisdictional purposes, the citizenship of Defendant Jacob Shearer (the nondiverse defendant), assume jurisdiction over the case, dismiss Defendant Jacob Shearer, and then retain jurisdiction over the matter.

28.    "The very fact that Congress has provided defendants with the right of removal indicates that the removal right 'is at least as important as the plaintiff's right to the forum of his choice,' and the statutory right to removal should not be 'easily overcome by tactical maneuvering by plaintiffs.'"  *Linnin v. Michielsens*, 372 F.Supp.2d 811, 816–17 (E.D.Va. 2005) (quoting *Mulcahey v. Columbia Organic Chem. Co., Inc.*, 29 F.3d 148, 151 (4th Cir. 1994)).  Because remand is not reviewable on appeal or otherwise and, as a result, a defendant ordinarily forever loses its right to a federal forum upon remand, caution should be exercised so that a defendant is not erroneously deprived of its right to a federal forum.  *See Linnin*, *supra*; *Cheshire v. Coca–Cola Bottling Affiliated, Inc.*, 758 F.Supp. 1098, 1100 (D.S.C. 1990); 28 U.S.C. § 1447(d).  As such, "the Federal courts may and should take such action as will defeat attempts to wrongly deprive parties entitled to sue in the Federal courts of the protection of their rights in those tribunals." *Alabama Great S. Ry. Co. v. Thompson*, 200 U.S. 206, 218 (1906).  Courts are obligated to ensure the removal procedure is fair to "both plaintiffs and defendants alike."  *McKinney v. Bd. Of Tr. Of Mayland Cmty. Coll.*, 955 F.2d 924, 927 (4th Cir. 1992).

29.    "The 'fraudulent joinder' doctrine permits removal when a non-diverse party is (or has been) a defendant in the case.  Under this doctrine, a district court can assume jurisdiction over

a case even if, *inter alia*, there are nondiverse named defendants at the time the case is removed. This doctrine effectively permits a district court to disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." *Mayes v. Rapoport*, 198 F.3d 457, 461 (4th Cir. 1999) (internal citations omitted); *see Johnson v. American Towers, LLC*, 781 F.3d 693 (4th Cir. 2015).

30.    The fraudulent joinder doctrine may be applied in two instances: (1) outright fraud in the plaintiff's pleading of jurisdictional facts; or (2) there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court. *See Johnson*, *supra*.

31.    Defendants rely on the latter in asserting the fraudulent joinder doctrine should be applied because the South Carolina Long Term Health Care Administrators statute (S.C. Code Ann. §§ 40-35-5 to -260) does not provide for a right of action against a nursing home administrator by a resident.  S.C. Code Ann. §§ 40-35-5 to -260 (providing disciplinary action and civil penalty powers to only the South Carolina Board of Long Term Health Care Administrators); *see Hubbard v. Taylor*, 339 S.C. 582, 529 S.E.2d 549 (Ct. App. 2000) (holding the nursing home director did not owe any duty to the resident independent of that he owed as operator of the home); *Cf. Mariner Health Care, Inc. v. Estate of Edwards*, 964 So.2d 1138, 1156 (Miss. 2007) ("[N]ursing home licensees and administrators owe duties to their employers, but … owe no common-law or statutory duty to the residents of the home."); *Howard v. Estate of Harper, 947 So.2d 854* (Miss. 2006) (holding a nursing home administrator owed no common law or statutory duty of care to a patient, could not be held liable for medical malpractice, and a fiduciary could

not exist simply by virtue of the administrator's license as it would be duplicative to the duties already owed by the nursing home or the owner).

32.     Thus, any duties owed by Defendant Jacob Shearer are to Defendant NHC HealthCare/Greenwood, LLC, and the licensing authorities, and not to Plaintiff.

33.     Because Plaintiff has no cause of action against Defendant Jacob Shearer, his citizenship should be ignored for jurisdictional purposes, and because it is abundantly clear Defendant Jacob Shearer was only added as a Defendant in an effort to destroy diversity jurisdiction as he was only added as a Defendant after the matter was removed then dismissed, the Court should assume jurisdiction over the case, dismiss Defendant Jacob Shearer, and the Court should retain jurisdiction over the matter.

## BASIS FOR 28 U.S.C. § 1331 JURISDICTION

34.     Pursuant to 28 U.S.C. § 1331, the District Courts of the United States of America have "original jurisdiction of all civil actions arising under the Constitution, laws, or treatises of the United States."

35.     A State law claim may be removed to Federal court when Congress expressly provides so or when a Federal statute wholly displaces the State law cause of action through complete preemption.  In two instances (LMRA and ERISA claims), the United States Supreme Court has found complete preemption related to State law causes of action because the Federal statutes at issue provided the exclusive cause of action for the claims asserted, and set forth procedures and remedies governing the cause of action.  That is, Federal question jurisdiction under the complete preemption doctrine was proper because the provisions of Federal law collectively superseded the substantial and remedial provisions of state law and created an exclusive federal remedy.  Thus, even where a plaintiff pleads in terms of State law, where there

is complete preemption of the claim, in reality, the claim is based on Federal law, and Federal question jurisdiction exists. *See Beneficial Nat. Bank v. Anderson*, 539 U.S. 1 (2003).

36.     Similarly, the Second Circuit has applied the complete preemption doctrine to the Air Transportation Safety and System Stability Act ("ATSSSA"). The ATSSSA, which is structurally and schematically similar to the PREP Act, was enacted after the September 11th terrorist attacks, creating an exclusive federal cause of action for damages "arising out of the hijacking and subsequent crashes." The ATSSSA includes a victim's compensation fund, and claims are limited to the fund and do not provide punitive damages awards. As the Second Circuit found, Congressional goals in enacting the ATSSSA including "provid[ing] relief without litigation to individuals harmed as a result of the crashes and to limit the liability of entities that were likely to be sued for injuries suffered in connection with the crashes." *See* 49 U.S.C. §§ 40101, *et seq*.; *In re WTC Disaster Site*, 414 F.3d 352 (2d Cir. 2005); 147 Cong. Rec. S9592 (Sept. 21, 2001) (statement of Sen. Schumer) ("The intent here is to put all civil suits arising from the tragic events of September 11 in the Southern District."); 147 Cong. Rec. S9594 (Sept. 21, 2001) (statement of Sen. McCain) ("the bill [ATSSSA] attempts to provide some sense to the litigation by consolidating all civil litigation from the terrorist attacks of September 11 in one court."); 147 Cong. Rec. S9595 (Sept. 21, 2001) (statement of Sen. Hatch) ("[W]e consolidated the causes of action in one Federal court so that there will be some consistency in the judgments awarded.").

37.     The PREP Act was enacted on December 30, 2005 as part of the national emergency response framework and the Public Service Health Act (42 U.S.C. § 201, et seq.). In the Public Health Service Act, Congress entrusted HHS to administer public health functions, including Federal-State cooperation in times of a national health crisis, such as a pandemic/epidemic. 42 U.S.C. § 243.

38.    The PREP Act enables the Secretary of the United States Department of Health and Human Services (hereinafter "HHS Secretary") to declare that a public health emergency exists and to take appropriate action to lead the national response.  42 U.S.C. § 247d-6d.  The PREP Act authorizes the HHS Secretary to provide civil immunity to individuals and companies participating in the national emergency response.  *Id*.  Once the HHS Secretary issues a declaration, the PREP Act provides "covered persons" broad immunity "from suit and liability under Federal and State law with respect to all claims for loss arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure."  42 U.S.C. § 247d-6d(a)(1); *see* 42 U.S.C. 247(d)(a)(2)(A) (defining "loss" as "any type of loss, including" death, personal injury, and others).

39.    The PREP Act defines several relevant terms including "covered countermeasure," "covered person," "distributor," "person," "program planner," "qualified pandemic or epidemic product," and "qualified person."

40.    "Covered countermeasures" means a qualified pandemic or epidemic product, a security countermeasure, a drug, biological product, or device authorized for emergency use in accordance with section 564, 564A, or 564B of the Federal Food, Drug, and Cosmetic Act, or a respiratory protective device approved by the National Institute for Occupational Safety and Health, and that the HHS Secretary determines to be a priority for use during the public health emergency.  42 U.S.C. § 247d-6d(i)(1).

41.    "Covered persons" are manufacturers distributors, and program planners of such covered countermeasures, as well as a qualified person who prescribed, administered, or dispensed such covered countermeasures.  The term also includes an official, agent, or employee of a manufacturer, distributor, program planner, or qualified person.  42 U.S.C. § 247d-6d(i)(2).

42.    A "distributor" means a person or entity engaged in the distribution of drugs, biologics, or devices and includes—but is not limited to—common carriers, warehouses, and retail pharmacies, among others.  42 U.S.C. § 247d-6d(i)(3).

43.    The PREP Act defines the term "person" broadly to include individuals, partnerships, corporations (public or private), associations, entities, and Federal, State, or local government agencies or departments.  42 U.S.C. § 247d-6d(i)(5).

44.    The PREP Act defines a "program planner" as a "person who supervised or administered a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with a declaration under [42 U.S.C. 247d-6d(b)]."  42 U.S.C. § 247d-6d(i)(6).

45.    The "qualified pandemic or epidemic products" are without limitation, drugs, biological products, or devices manufactured, used, designed, developed, modified, licensed, or procured to diagnose, mitigate, prevent, treat, or cure a pandemic or epidemic, or to limit the harm such pandemic or epidemic might otherwise cause.  42 U.S.C. § 247d-6d(i)(7)(A).  The term also includes drugs, biologic products, and devices approved or cleared by the FDA or authorized for emergency use.  42 U.S.C. § 247d-6d(i)(7)(B)(i & iii).

46.    The term "qualified person" is broadly defined as a "licensed health professional or other individual who is authorized to prescribe, administer, or dispense [covered] countermeasures under [applicable State law]" and any "person within a category of person so identified in a declaration [issued pursuant to 42 U.S.C. 247d-65d(b)]."  42 U.S.C. § 247d-6d(i)(8).

47.    The PREP Act preempts any state law that "is different from, or in conflict with, any requirement applicable under [the PREP Act] and relates to the … distribution … use… dispensing … or administration by qualified persons of the covered countermeasure[.]" 42 U.S.C. § 247d-6d(b)(8).

48.    The PREP Act provides the exclusive remedy for claims for injury related to a covered defendant's use of countermeasures for PREP Act related claims, and it provides immunity against such claims under all other laws.  42 U.S.C. §§ 247d-6d, 247d-6e.

49.    The exclusive remedy provided by the PREP Act is through the Covered Countermeasures Process Fund which allows an individual to make a claim for benefits for "covered injuries directly caused by the administration or use of a covered countermeasure[.]" 42 U.S.C. § 247d-6e.  That Fund provides "timely, uniform, and adequate compensation to eligible individuals for covered injuries directly caused by the administration or use of a covered countermeasure pursuant to [a declaration under 42 U.S.C. § 247d-6d(b)]." 42 U.S.C. § 247d-6e.

50.    The sole exception to the immunity is for a PREP Act claim based upon "willful misconduct," but this sole exception gives rise to an exclusively Federal cause of action subject to heightened pleading requirements.  42 U.S.C. § 247d-6d(d)–(e).  Moreover, any such claim based on allegations of "willful misconduct" "shall be filed and maintained only in the United States District Court for the District of Columbia," is subject to pleading particularities and verification, and must be brought before a three-judge panel.  42 U.S.C. § 247d-6d(e).

51.    "Willful misconduct" under the PREP Act is defined as "an act or omission that is taken—(i) intentionally to achieve a wrongful purpose; (ii) knowingly without legal or factual justification; and (iii) in disregard of a known or obvious risk that is so great as to make it highly probable that the harm will outweigh the benefit." 42 U.S.C. § 247d-6d(c)(1)(A).  The Prep Act

further clarifies that willful misconduct "shall be construed as establishing a standard for liability that is more stringent than a standard of negligence in any form or recklessness." 42 U.S.C. § 247d-6d(c)(2)(A). Additionally, the burden of proof in proving a willful misconduct claim is by clear and convincing evidence. 42 U.S.C. § 247d-6d(c)(3)

52.    Because the PREP Act provides the exclusive cause of action, procedure, and remedy for losses injuries directly caused by the administration or use of a "Covered Countermeasure" by and "Covered Person," the complete preemption doctrine is implicated and, even where State law claims are made, the claims, in actuality, are based on Federal law, and Federal question jurisdiction exists. In short, the PREP Act wholly displaces State law causes of action for claims falling under the purview of the PREP Act and declarations issued pursuant to the PREP Act. *See Rachal v. Natchitoches Nursing & Rehab Center, LLC*, Civil Docket No. 1:21-CV-00334 (W.D. La. April 30, 2021) (finding the PREP Act is a complete preemption statute and dismissing the plaintiff's claims based on the PREP Act's applicability); *Garcia v. Welltower OpCo Group, LLC*, No. 8:20-cv-02250-JVS-KESx (C.D. Cal. Feb. 10, 2021) (finding the agency interpretations of the PREP Act were entitled to deference, that the PREP Act provides for complete preemption, and that the defendants' actions fell within the PREP Act's protections); Fifth Advisory Opinion (explaining that the PREP Act is a complete preemption statute); s*ee also Bruesewitz v. Wyeth*, 562 U.S. 223, at 253 (2011) (*dissent*, J. Sotomayor); *cf In re WTC Disaster Site*, *supra*; ATSSSA.

53.    Alternatively, because the PREP Act provides the sole remedies for the claims advanced in the Complaint, and because Plaintiff specifically claims Defendants did not comply with CDC (Federal) guidelines or regulations or to the extent that Plaintiff seeks to invoke the sole exception to the immunity provided under the PREP Act, i.e., a claim for "willful misconduct" (42

U.S.C.A. § 247d-6d(d)) via the sole allegation of gross negligence, removal is proper because the Complaint presents an "embedded federal question." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) citing *Grable & Sons Metal Prods. v. Darue Engineering & Mfg.,* 545 U.S. 308, 314 (2005) ("federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress.").

54.    COVID-19 is an acute respiratory disease caused by the SARS-CoV-2 betacoronavirus or a virus mutating therefrom, and is similar to Middle Eastern Respiratory Syndrome (MERS) and Severe Acute Respiratory Syndrome (SARS).  Although the complete clinical picture regarding SARS-CoV-2 or a virus mutating therefrom is not fully understood, the virus has been known to cause severe respiratory illness and death in a subset of those people infected with such virus(es).  In December 2019, the novel coronavirus was detected in Wuhan City, Hubei Province, China.  On January 30, 2020, the World Health Organization (WHO) declared the COVID-19 outbreak to be a Public Health Emergency of International Concern.  On January 31, 2020, the HHS Secretary declared a public health emergency pursuant to section 319 of the Public Health Service Act, 42 U.S.C. § 247d, for the entire United States to aid in the nation's health care community response to the COVID-19 outbreak.  The outbreak remains a significant public health challenge that requires a sustained, coordinated proactive response by the Government in conjunction with private entities in order to contain and mitigate the spread of COVID-19.  COVID-19 has taken an unprecedented toll on the nation—and the world—stretching healthcare personnel, equipment, devices, and other resources.  *See generally* the Declarations.

55.    On March 17, 2020, the Secretary of the United States Department of Health and Human Services issued the Declaration determining COVID-19 constitutes a public health

emergency, providing immunity for liability for "Recommended Activities" including manufacturing, testing, development, distribution, administration, and use of "Covered Countermeasures" by "Covered Persons" and "Qualified Persons."

56.     The Initial Declaration broadly defined "administration" to include "physical provision of the countermeasures to recipients, or activities and decisions relating to public and private delivery, distribution and dispensing of the countermeasures to recipients, management and operation of countermeasure programs, or management and operation of location for [the] purpose of distributing and dispensing countermeasures." *See* Initial Declaration.

57.     The Initial Declaration did not define "use" or "used," but Amendments to the Initial Declaration and the HHS Advisory Opinions clarified that the terms "administration" and "use" are not to be construed in the narrow, affirmative only sense (i.e., a "black and white" view) but, rather, should also be interpreted in the negative sense (i.e., non-administration or non-use). Specifically, the Fifth HHS Advisory Opinion explicitly rejected such a narrow interpretation as it "clashes with the plain language of the PREP Act, which extends immunity to anything 'relating to' the administration of a covered countermeasure."

58.     The Initial Declaration broadly defined "Covered Countermeasures" to include "any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine used to treat, diagnose, cure, prevent, or mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, or any device used in the administration of any such product, and all components and constituent materials of any such product." Generally speaking, and without limitation, "Covered Countermeasures" include personal protective items ("PPE") such as face masks, face shields, sterilization and cleaning supplies, COVID-19 tests, and social distancing

measures.  The Initial Declaration was amended to further broaden the scope of "Covered Countermeasures."  *See* Declarations.

59.    The Declarations have defined the term "Covered Persons" to include manufacturers, distributors, program planners, qualified persons, and their officials, agents, and employees as those terms are defined in the PREP Act.  The Declarations also lists additional "qualified persons" including "(a) [a]ny person authorized in accordance with the public health and medical emergency response of the Authority Having Jurisdiction … to prescribe, administer, deliver, distribute or dispense the Covered Countermeasures, and their officials, agents, employees, contractors and volunteers, following a Declaration of an emergency; (b) any person authorized to prescribe, administer, or dispense the Covered Countermeasures or who is otherwise authorized to perform an activity under an Emergency Use Authorization in accordance with Section 564 of the FD&C Act; and (c) any person authorized to prescribe, administer, or dispense Covered Countermeasures in accordance with Section 564A of the FD&C Act."  *See* Declarations.

60.    The term "Authority Having Jurisdiction" means the "public agency or its delegate that has legal responsibility and authority for responding to an incident, based on political or geographical (e.g., city, county, tribal, state, or federal boundary lines) or functional (e.g., law enforcement, public health) range of sphere or authority."  *See* Declarations.  Essentially, so long as an individual or entity is "authorized" under any applicable law to use or administer a covered countermeasure, they are a "covered person" in some form.

61.    A "program planner" includes, without limitation, any "person who supervises or administers a program with respect to the administration, dispensing, distribution, provision, or use of a Covered Countermeasure, including a person who establishes requirements, provides policy guidance, or supplies technical or scientific advice or assistance or provides a facility to

administer or use a Covered Countermeasure in accordance with the Secretary's Declaration."
Further, private sector employers are program planners where the private sector employer carries
out the above-described activities. *See* Declarations.

62.     For the reasons discussed below, the PREP Act and its immunities apply to this
matter, as Defendants were acting as a "Covered Person" in their use, administration, and
distribution of "Covered Countermeasures." Thus, this Court has jurisdiction pursuant to 28
U.S.C. § 1331.

63.     First, Plaintiff's claim is a loss "caused by, arising out of, resulting from, or relating
to" the "use" and "administration" of "Covered Countermeasures." Plaintiff claims Defendants
were grossly negligent and reckless in failing follow CDC guidance related to the prevention of
COVID-19 spread in skilled nursing facilities.

64.     Second, Plaintiff's allegations explicitly and implicitly assert improper use,
implementation, and administration of social distancing, screening, and infection control measures
(i.e., "Covered Countermeasures") used to mitigate, prevent, treat, or limit the harm or spread of
COVID-19 under the PREP Act. Defendants were, in fact, using and administering various
"Covered Countermeasures" used to mitigate, prevent, or limit the harm or spread of COVID-19
under the PREP Act. Without limitation, these covered countermeasures included face masks,
face shields, sterilization and cleaning supplies, COVID tests, and social distancing measures.
Importantly, if there were any doubt as to whether Defendants were engaged in a covered activity,
the Declarations' broad and sweeping definition of "Administration" as including the "decisions
directly relating to public and private delivery, distribution, and dispensing of the countermeasures
to recipients" quells any doubt as Decedent was among numerous other recipients of "Covered
Countermeasures" administered and used by Defendants. The plain language of Plaintiff's

Complaint demonstrates Plaintiff's claims do not involve nonfeasance or total inaction but, instead, involve Defendants' decision-making processes related to administration, implementation, and use of COVID-19 covered countermeasures.

65.    Third, Defendants are "Covered Person[s]" under the PREP Act and the Declarations as they were and are "Qualified Person[s]" and/or "Program Planner[s]." Defendants were charged with dispensing, using, implementing, and administering "Covered Countermeasures" and Defendant NHC HealthCare/Greenwood, LLC's employees include nurses and licensed practical nurses, among others. Such individuals are licensed health professionals authorized to dispense, use, and administer "Covered Countermeasures" as "Qualified Persons." Defendants are also "Program Planners" as they "supervise[d] or administered[d] a program with respect to the administration, dispensing, distribution, or use of a Covered Countermeasure" within NHC Greenwood, and "establishe[d] requirements, provide[d] policy guidance [and] … provide[d] a facility to administer or use a 'Covered Countermeasure[.]'" *See* Fourth HHS Advisory Opinion (advising the PREP Act broadly defines a "Program Planner" and "any… organization can be potentially a program planner and receive PREP Act coverage"); *Id.* (providing an example wherein a university is immune from suit and liability for loss as a "Program Planner"); Fifth HHS Advisory Opinion ("A program planner is someone who is involved in providing or allocating covered countermeasures. Program planning inherently involves the allocation of resources and when those resources are scarce, some individuals are going to be denied access to them. Therefore, decision-making that leads to the non-use of covered countermeasures by certain individuals is the grist of program planning, and is expressly covered by PREP Act.").

66.     Moreover, Plaintiff's Complaint is devoid of any allegations of ordinary negligence and only alleges gross negligence and recklessness.  Gross negligence and recklessness, in the context of Plaintiff's allegations, equate to a claim for willful misconduct as that term is defined by the PREP Act, which is an exclusively Federal cause of action and only may be brought in the United States District Court for the District of Columbia.  Again, in case there were any question as to whether Plaintiff seeks to invoke the willful misconduct exception, Plaintiff's expert opined, and Plaintiff alleges, that Defendants were grossly negligent and reckless by allegedly requiring COVID-19 positive employees to return to work and care for residents, including Decedent.

67.     Thus, even assuming Plaintiff's allegations are true as plead, Defendants were acting as "Covered Person[s]" in their use, administration, implementation, and distribution of "Covered Countermeasures" pursuant to the PREP Act and Declaration.  Therefore, Plaintiff's claims necessarily invoke the PREP Act and its procedural requirements for seeking relief of the alleged covered injury.

68.     Similarly, Federal jurisdiction exists where an action "arises under" Federal law and raises a Federal issue, actually disputed and substantial.  *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).

69.     As exhibited in the Fourth Amended Declaration, the PREP Act confers a separate, independent ground for Federal question jurisdiction under the *Grable* doctrine.  Importantly, the Fourth Amended Declaration incorporated the HHS Advisory Opinions, and stated "there are substantial federal legal and policy issues, and substantial federal and legal policy interests within the meaning of [the Grable doctrine] in having a unified, whole-of-nation response to the COVID-19 pandemic among federal, state, local, and private-sector entities."  *See* Fourth Amended Declaration.

70.    The Fourth Amended Declaration further states "Congress delegated to me [the HHS Secretary] the authority to strike the appropriate Federal-state balance with respect to particular Covered Countermeasures through PREP Act declarations."  The HHS Secretary's interpretation of *Grable* is consistent with our Supreme Court's instruction "that in certain cases federal question jurisdiction will lie over state law claims that implicate federal issues" in hopes that Federal courts offer "experience, solicitude, and hope of uniformity" in analyzing and applying Federal laws.  *See Grable*, 545 U.S. at 312.

71.    Shortly thereafter, the Fifth HHS Advisory Opinion was issued, noting the Fourth Amended Declaration's *Grable* effect and stating "ordaining the metes and bounds of PREP Act protection in the context of a national health emergency necessarily means that the case belongs in federal court."

72.    The *Grable* court held there is no single test for determining whether an embedded federal issue exists, but that, in general, a two-step process determines whether a State law claim "arises under" federal law.  First, the State law claim must necessarily raise a stated Federal issue that is actually disputed and substantial.  Second, Federal courts must be able to entertain the State law claims "without disturbing a congressionally approved balance of state and federal judicial responsibilities."  *Grable*, 545 U.S. at 314; see also *Merrell Dow Pharms. Inc. v. Thompson*, 478 US 804, 808 (1986).

73.    Both steps of the *Grable* analysis are met in this action.

74.    First, Plaintiff's claims concern Defendants' alleged failure to follow CDC guidance which allegedly allowed Decedent to be exposed to and contract COVID-19.  This allegation necessarily implicates disputed and substantial Federal issues as it involves, at a

minimum, interpretation of the PREP Act, the Declarations, the HHS Advisory Opinions, CDC and CMS directives, and Defendants' response to and compliance with the same.

75.    Second, as confirmed by the Fifth HHS Advisory Opinion and the Declarations, the exercise of Federal jurisdiction will not upset Federal-State comity principles as the PREP Act clearly expresses Congressional intent to supersede and preempt State law surrounding the issues raised by Plaintiff, and Federal courts are better positioned and more likely to ensure uniform application of the relevant Federal law. Notably, the HHS Secretary recognized that "Congress delegated to [him] the authority to strike the appropriate Federal-state balance with respect to the particular Covered Countermeasures through PREP Act declaration."

76.    Additionally, the Ninth Amended Declaration—issued September 14, 2021— reaffirmed the PREP Act's clear preemptive effective and noted "preemption of State law is justified to respond to the nation-wide public health emergency caused by COVID-19 as it will enable States to quickly expand the vaccination, treatment and prevention workforces with additional qualified healthcare professionals where State or local requirements might otherwise inhibit or delay allowing these healthcare professionals to participate in the COVID-19 countermeasure program."

77.    Accordingly, this Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## BASIS FOR 28 U.S.C. § 1442(A)(1) JURISDICTION

78.    28 U.S.C. § 1442(a)(1) requires removal when a defendant is sued for acts undertaken at the direction of a Federal Officer, and the statute is to be broadly construed in favor of a Federal forum.

79.    The Congressional policy that Federal Officers, the Federal Government, and those working at their direction require and are entitled to a Federal forum "should not be frustrated by a narrow, grudging interpretation."[6]

80.    In the unique regulatory context and scheme related to COVID-19, Defendants became an extension of the Federal Government and its agencies and officers, carrying out their instructions with little or no discretion of their own.  This is precisely the environment where Federal Officer Removal Jurisdiction can and does apply.  Defendants acted at and upon the direction, guidance, instructions, recommendation, and advice of the United States Government and Federal Officers including, without limitation, the following:

81.    On January 17, 2020, the CDC issued a health alert to the nation regarding COVID-19.[7]

82.    On January 31, 2020, HHS Secretary Alex Azar declared a public health emergency pursuant to Section 319 of the Public Health Service Act, 42 U.S.C. § 247d, in response to the COVID-19 outbreak.[8]

83.    On February 1, 2020, the CDC issued criteria for screening of patients/residents for COVID-19 in healthcare facilities.[9]

---

[6] *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *Arizona v. Maypenny*, 451 U.S. 232, 242 (1981).

[7] Update and Interim Guidance on Outbreak of 2019 Novel Coronavirus (2019-nCoV) in Wuhan, China, Centers for Disease Control and Prevention (Jan. 17, 2020, 8:30 PM), https://emergency.cdc.gov/han/han00426.asp.

[8] Determination that a Public Health Emergency Exists, U.S. Department of Health & Human Services, Office of the Assistant Secretary for Preparedness and Response (Jan. 31, 2020), https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.

[9] Update and Interim Guidance on Outbreak of 2019 Novel Coronavirus (2019-nCoV), Centers for Disease Control and Prevention (Feb. 1, 2020, 9:00 AM),

84.    On February 6, 2020, CMS issued a notification to healthcare facilities to review the CDC's instructions on COVID-19.[10]

85.    On February 28, 2020, the CDC issued an interim update on COVID-19, clarifying testing, reporting, and evaluation criteria.[11]

86.    On February 29, 2020, the CDC again issued an interim instruction, this time focusing on preparation for community transmission of COVID-19.[12]

87.    On March 4, 2020, CMS instructed on managing the spread of COVID-19 in nursing homes.[13]

88.    On March 10, CMS issued separate instruction on the use of PPE.[14]

---

https://emergency.cdc.gov/han/han00427.asp.

[10] Information for Healthcare Facilities Concerning 2019 Novel Coronavirus Illness (2019-nCoV), Centers for Medicare and Medicaid Services (Feb. 6, 2020), https://www.cms.gov/files/document/qso-20-09-all.pdf.

[11] Update and Interim Guidance on Outbreak of Coronavirus Disease 2019 (COVID-19), Centers for Disease Control and Prevention (Feb. 28, 2020, 3:05 PM), https://emergency.cdc.gov/han/2020/han00428.asp.

[12] Interim guidance for healthcare facilities: preparing for community transmission of COVID-19 in the United States, Centers for Disease Control and Prevention (Feb. 29, 2020), https://stacks.cdc.gov/view/cdc/85502.

[13] Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in nursing homes, Centers for Medicare and Medicaid Services (Mar. 4, 2020), https://www.cms.gov/medicareprovider-enrollment-and-certificationsurveycertificationgeninfopolicy-and/qso-20-14-nh.pdf.

[14] Guidance for use of Certain Industrial Respirators by Health Care Personnel, Centers for Medicare and Medicaid Services (Mar. 10, 2020), https://www.cms.gov/files/document/qso-20-17-all.pdf.

89.     On March 13, 2020, CMS issued revisions for nursing homes, restricting "visitation of all visitors and non-essential health care personnel, except for certain compassionate care situations, such as an end-of-life situation."[15]

90.     On March 20, 2020, CMS suspended certain federal surveys for three weeks, limiting surveys to (1) complaints at the Immediate Jeopardy level; (2) facilities "most in need of additional oversight"; and (3) self-assessments by providers.[16]

91.     On March 28, 2020, the United States Department of Homeland Security, Cybersecurity & Infrastructure Security Agency recognized healthcare providers (such as Defendant) are part of the "critical infrastructure" of the United States, obligating Defendant to aid the Federal Government in preventing the spread of COVID-19.[17]  This designation allowed the Federal Government to enlist the aid of these private persons and entities to ensure continued operation of the healthcare infrastructure that is "so vital to the United States that [its] incapacity or destruction … would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters."  *See* 42 U.S.C. §§ 5195c(e) 5195c(b)(3).

---

[15] Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes (Revised), Centers for Medicare and Medicaid Services (Mar. 13, 2020), https://www.cms.gov/files/document/3-13-2020-nursing-home-guidance-covid-19.pdf.

[16] Prioritization of Survey Activities, Centers for Medicare and Medicaid Services (Mar. 20, 2020), https://www.cms.gov/files/document/qso-20-20-all.pdf.

[17] Advisory Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, United States Department of Homeland Security, Cybersecurity & Infrastructure Security Agency (Mar. 28, 2020), https://www.cisa.gov/sites/default/files/publications/CISA_Guidance_on_the_Essential_Critical_Infrastructure_Workforce_Version_2.0_1.pdf.

92.     On April 2, 2020, CMS again issued new directives to long-term care facilities, demanding that "nursing homes should immediately ensure that they are complying with all CMS and CDC guidance related to infection control."[18]

93.     On April 15, 2020, the CDC issued various "key strategies" to prepare for COVID-19 in long-term care facilities.[19]

94.     On April 24, 2019, the CDC again issued specialized instruction on protecting individuals who live in long-term care facilities from COVID-19, including answering various questions about topics such as admission/discharge criteria, compassionate care visitation, and health care workers permitted to enter facilities despite visitation restrictions.[20]

95.     On May 2, 2020, the CDC issued instruction for the decision to discontinue transmission-based precautions for patients with confirmed or suspected COVID-19.[21]

96.     On May 8, 2020, CMS established explicit reporting requirements for long-term care facilities to report information related to COVID-19 cases among facility residents and staff.[22]

---

[18] COVID-19 Long-Term Care Facility Guidance, Centers for Medicare and Medicaid Services (Apr. 2, 2020)  https://www.cms.gov/files/document/4220-COVID-19-long-term-care-facility-guidance.pdf.

[19] Preparing for COVID-19: Long-term Care Facilities, Nursing Homes, Centers for Disease Control and Prevention (Apr. 15, 2020), https://www.co.portage.oh.us/sites/g/files/vyhlif3706/f/pages/cdc_preparing_for_covid-19_long-term_care_facilities_nursing_homes_cdc_04.15.2020.pdf.

[20] Nursing Home Five Star Quality Rating System updates, Nursing Home Staff Counts, and Frequently Asked Questions, Centers for Medicare and Medicaid Services (Apr. 24, 2020), https://www.cms.gov/files/document/qso-20-28-nh.pdf.

[21] Discontinuation of Transmission-Based Precautions and Disposition of Patients with COVID-19 in Healthcare Settings (Interim Guidance), Centers for Disease Control and Prevention (May 2, 2020), https://stacks.cdc.gov/view/cdc/88538.

[22] 85 Fed. Reg. 27550; Medicare and Medicaid Programs, Basic Health Program, and Exchanges; Additional Policy and Regulatory Revisions in Response to the COVID-19 Public Health

97.    On May 18, 2020, CMS issued phased reopening recommendations, criteria, and schedules for nursing homes.[23]

98.    On June 1, 2020, CMS issued revised guidance for COVID-19 survey activities, CARES Act funding, enhanced enforcement for infection control deficiencies, and quality improvement activities in nursing homes.[24]

99.    On July 22, 2020 the CDC issued updated interim guidance on ending isolation for COVID-19 infection and healthcare worker return to work.  Included in this was that test-based strategies were no longer recommended to determine when to end isolation after COVID-19 infection and, instead, symptom-based criteria should be used instead.  This followed CDC guidance issued on July 17, 2020 regarding discontinuation of transmission-based precautions for those with known or suspected COVID-19 infection.[25]

---

Emergency and Delay of Certain Reporting Requirements for the Skilled Nursing Facility Quality Reporting Program, Centers for Medicare and Medicaid Services (May 8, 2020), https://www.federalregister.gov/documents/2020/05/08/2020-09608/medicare-and-medicaid-programs-basic-health-program-and-exchanges-additional-policy-and-regulatory.

[23] Nursing Home Reopening Recommendations for State and Local Officials (Revised), Centers for Medicare and Medicaid Services (May 18, 2020, as revised on Mar. 10, 2021), https://www.cms.gov/files/document/qso-20-30-nh.pdf-0.

[24] Revised COVID-19 Survey Activities, CARES Act Funding, Enhanced Enforcement for Infection Control deficiencies, and Quality Improvement Activities in Nursing Homes, Centers for Medicare and Medicaid Services (June 1, 2020), https://www.cms.gov/files/document/qso-20-31-all-revised.pdf.

[25] See Ending Isolation and Precautions for People with COVID-19: Interim Guidance, Centers for Disease Control and Prevention (July 22, 2020, subsequently amended), https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html; see also Summary of Updated Interim Guidance on Ending Isolation for COVID-19 Infection and Healthcare Worker Return to Work, S.C. Department of Health and Environmental Control, https://scdhec.gov/sites/default/files/media/document/10470-CHU-07-22-2020-COVID-19.pdf.

100.    On July 31, 2020, the Anthony S. Fauci, MD,  Director, national Institute of Allergy and Infectious Diseases, National Institutes of Health, Robert R. Redfield, MD, Director, Centers for Disease Control and Prevention, and Admiral Brett P. Giroir, MD, Assistant Secretary for Health, U.S. Department of Health and Human Services testified before the House Select Subcommittee on Coronavirus Crisis.[26]

101.    On August 10, 2020, the CDC issued guidance/criteria for healthcare personnel with COVID-19 to return to work.[27]

102.    On August 24, 2020, the CDC updated its COVID-19 Testing Overview guidance.[28]

103.    On August 25, 2020, CMS announced sweeping regulatory changes that required nursing homes to test staff and offer testing to residents for COVID-19.[29]  The same day, CMS launched an unprecedented national nursing home training program for frontline nursing home

---

[26] The Urgent Need for a National Plan to Contain the Coronavirus, House Select Subcommittee on Coronavirus Crisis (July 31, 2020), https://www.cdc.gov/washington/testimony/2020/t20200731.htm.

[27] Criteria for Return to Work for Healthcare Personnel with SARS-CoV-2 Infection (Interim Guidance) Return-to-Work Criteria, Centers for Disease Control and Prevention (Aug. 10, 2020), https://riala.memberclicks.net/assets/Return-to-Work%20Criteria%20for%20Healthcare%20Workers%20_%209.8.2020%20CDC.pdf.

[28] Testing Overview, Centers for Disease Control and Prevention (Aug. 24, 2020, as amended), https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html.

[29] Medicare and Medicaid Programs, Clinical Laboratory Improvement Amendments (CLIA), and Patient Protection and Affordable Care Act; Additional Policy and Regulatory Revisions in Response to the COVID-19 Public Health Emergency, Centers for Medicare and Medicaid (Aug. 25, 2020), https://www.cms.gov/files/document/covid-ifc-3-8-25-20.pdf.

staff and nursing home management designed to equip frontline caregivers and management with knowledge to help stop the spread of COVID-19.[30]

104.    On August 26, 2020, CMS released guidance for nursing homes to assist in enhancing their abilities to prevent the spread of COVID-19 to residents and front-line staff.[31]

105.    Federal Court jurisdiction under 28 U.S.C. § 1442(a)(a), commonly referred to as Federal Officer jurisdiction, exists where (1) a defendant has acted under the direction of a federal officer, (2) there was a causal connection between its actions and the official authority, (3) the defendant has a colorable federal defense to the plaintiff's claims, and (4) the defendant is a "person" within the meaning of the statute. *See e.g.*, *Jefferson County v. Acker*, 527 U.S. 423, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999); *Dahl v. R.J. Reynolds Tobacco Co.*, 478 F.3d 965 (8th Cir. 2007).

106.    To establish the first element, a "private person's 'acting under' must involve an effort to assist, or to help carry out, the duties or task of the federal superior." *Watson v. Phillip Morris Companies, Inc.*, 551 U.S. 142, 152 (2007). In cases involving a private entity, the "acting under" relationship requires that there be at least some exertion of "subjection, guidance, or control" on the part of the federal government. *Id.*, 551 U.S. at 151. While not limitless, "the words 'acting under' are broad." *Id.*, 551 U.S. at 147. Federal courts have rejected the idea that a defendant is only "'acting under' a federal officer if the complained-of conduct was done at the

---

[30] Trump Administration Launches National Training Program to Strengthen Nursing Home Infection Control Practices, Centers for Medicare and Medicaid Services (Aug. 25, 2020), https://www.cms.gov/newsroom/press-releases/trump-administration-launches-national-training-program-strengthen-nursing-home-infection-control.

[31] Interim Final Rule (IFC), CMS-3401-IFC, Additional Policy and Regulatory Revisions in Response to the COVID-19 Public Health Emergency related to Long-Term Care (LTC) Facility Testing Requirements and Revised COVID19 Focused Survey Tool, Centers for Medicare and Medicaid (Aug. 26, 2020), https://www.cms.gov/files/document/qso-20-38-nh.pdf.

specific behest of the federal officer or agency." *Papp v. Fore-Kast Sales Co*., 842 F.3d 805, 813 (3rd Cir. 2016). Detailed regulation compelling specific conduct satisfies the "acting under" element. *Winters v. Diamond Shamrock Chem. Co*., 149 F.3d 387 (5th Cir. 1998).

107. Under normal circumstances, NHC HealthCare/Greenwood, LLC is relatively free to operate as it sees fit (within the confines of the general regulatory scheme, of course) without daily and weekly Federal directives on exactly how the facility must operate. When the COVID-19 pandemic hit, however, the center was required to overhaul its operations and practices (e.g., visitation, communal activities, screening, quarantine, etc.) in order to comply with ongoing, detailed CMS and CDC instructions and demands. In the early stages of the pandemic, healthcare providers were identified as part of the "critical infrastructure" of the United States, obligating them to aid the Federal Government's efforts in preventing and mitigating the spread of the virus. As can be seen above, these obligations included following a plethora of instructions issued by the Federal Government and its agencies over an extended period of time on virtually every aspect of COVID-19 testing, screening, reporting, prevention, and mitigation. In the midst of this, CMS recognized that it was responsible for ensuring the health and safety of long-term care residents.

108. As demonstrated, the direction and regulation of long-term care facilities, skilled nursing facilities, nursing homes, and the healthcare personnel working therein by the Federal Government concerning COVID-19 was, and continues to be, exceedingly complex, and has pervaded virtually every aspect of the day-to-day operations of these facilities. The control exerted by the Federal Government over Defendants and other long-term care facilities, skilled nursing facilities, and nursing homes due to the COVID-19 pandemic has been unprecedented and is a marked, drastic change from the normal regulatory scheme. The Federal Government and Federal Officers issued specific, detailed, pointed directives at such a rapid pace that Defendants and

similar facilities and healthcare personnel were constantly acting under the direct influence and ever-changing orders of the Federal Government and Federal officers.

109.    Defendants, like many others in its situation, worked tirelessly to assist and carry out the directives, orders, advice, and instructions of the Federal Government and Federal Officers as a means of maintaining the critical infrastructure of the United States.  Defendants acted "to assist, or help carry out, the duties or tasks of the federal superior," by helping the Federal Government fulfill basic governmental tasks that the Federal Government would otherwise have had to—but could not—perform itself by and through the directives of CMS and the CDC.

110.    To establish the second element, it is not necessary for the defense to be "clearly sustainable" or for the defendant to "win his case before he can have it removed."  *Jefferson Cnty.*, 527 U.S. at 431–32.  Even if the defense is ultimately rejected, it still may be colorable.  *Jefferson Cnty,*, 527 U.S. at 431.  "Certainly, if a defense is plausible, it is colorable."  *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 297 (5th Cir. 2020) (comparing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (a plausible claim survives a motion to dismiss), with *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction."), and *Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co*., 341 U.S. 246, 249 (1951) ("If the complaint raises a federal question, the mere claim confers power to decide that it has no merit, as well as to decide that it has.").

111.    For sake of brevity, Defendants incorporate the entirety of their arguments raised above related to the PREP Act and assert the PREP Act raises a colorable Federal defense.  In short, the plain statutory language of the PREP Act is that it applies to "all claims for loss caused by, arising out of, relating to, or resulting from the administration to or use by an individual of a

covered countermeasure."  Had Congress intended a narrow interpretation of the PREP Act, it would not have included such broad, all-encompassing language in the statute, and it is the duty of the courts to give effect to every clause and word of the statute.  Over the past year, numerous similarly situated defendants have raised the PREP Act as a defense to the same or similar allegations, and some courts have found the PREP Act applies to the allegations and dismissed the claims for that reason.  Several of these cases are pending in Federal appellate courts as well. As described herein, the law does not require Defendants to demonstrate they will clearly win on the merits of this defense; rather, it only requires that the defense be colorable and further requires the Court to view the defense most favorably to the defendant.

112.    Moreover, the colorable federal defense element is further met as the alleged wrongful acts were again taken to comply with Federal directives issued by CMS and the CDC, and other Federal Government agencies and officers, in response to the COVID-19 pandemic, and because Defendants were designated as part of the "critical infrastructure" of the United States which required them to carry out the vital operations and duties of the Federal Government. Accordingly, Defendants may raise any and all available defenses based on acting at the direction, instruction, and order of the Federal Government and based on its "critical infrastructure" designation.

113.    To establish the third element, the defendant again need not establish an "airtight case on the merits." *Jefferson Cnty.*, 527 U.S. at 432.  The statute only requires that the alleged conduct have been undertaken "for or relating to" a Federal officer.  "A 'causal nexus' between the claims at issue and a defendant's action under color of law exists when the claims arise as a consequence of the defendant carrying out the directives of a federal officer." *CRGT, Inc. v. Northrop Grumman Sys. Corp.*, 2012 WL 3776369 (E.D.Va. Aug. 28, 2012) (citing *Winters v.*

*Diamond Shamrock Chem. Co.*, 149 F .3d 387, 398 (5th Cir. 1998). The legislative history of the Federal Officer Removal statute also shows that the addition of the words "or relating to" was intended to "broaden the universe of acts that enable Federal officers to remove to Federal court." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia*, 790 F.3d 457, 471–72 (3rd Cir. 2015) (citing H.R.Rep. No. 112–17, pt. 1 (2011), as reprinted in 2011 U.S.C.C.A.N. 420, 425).

114. Plaintiff's Complaint specifically alleges deficiencies in Defendants' response to the COVID-19 pandemic, and COVID-19 guidance based upon the same. As established above, Defendants' actions in response to the COVID-19 pandemic were taken while "acting under" and "for or relating to" the directives and orders of Federal officers about Defendants' COVID response efforts. Defendants were mandated to follow these specific, pointed instructions, which were issued due to the novel nature of the COVID-19 pandemic and Defendants' designation as part of the "critical infrastructure." Overall, this establishes a clear causal nexus between the claims and Defendants' alleged actions.

115. Finally, to establish the fourth element, the Court need not look any further than 1 U.S.C. § 1 which defines "person" to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."

116. Because the elements for Federal Officer Jurisdiction are met, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1442(a)(1). *See Wazelle v. Tyson Foods, Inc.*, No. 20-cv-203 (N.D. Tex. June 25, 2021) (noting the designation as a critical infrastructure significant in finding the defendant was acting under a Federal Officer during the COVID-19 pandemic); *Fields v. Brown*, No. 6:20-cv-00478, 2021 WL 51620 (E.D. Tex. Feb. 11, 2021) (same).

## CONCLUSION

117.     Although complete diversity does not exist between Plaintiff and Defendants, Defendants request the Court apply the fraudulent joinder doctrine to disregard, for jurisdictional purposes, the citizenship of Defendant Jacob Shearer (the nondiverse defendant), assume jurisdiction over the case, dismiss Defendant Jacob Shearer, and retain jurisdiction over the matter.

118.     This Court has original jurisdiction over this action under 28 U.S.C. § 1331 because State law claims are completely preempted by the Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U.S.C. §§ 247d-6d, 247d-6e and, thus, Plaintiff's claims arise under Federal law.  Alternatively, this Court has original jurisdiction over this action under 28 U.S.C. § 1331 and the *Grable* doctrine because the Complaint presents embedded Federal questions.

119.     This Court has original jurisdiction over this action under 28 U.S.C. 1442(a) as Defendants acted at and upon the direction, guidance, recommendation, and advice of the United States Government and Federal Officers.

120.     Concurrent to the filing of this Notice, Defendants will have notified the Circuit Court of the State of South Carolina for Greenwood County and all parties of the removal of this action from that Court pursuant to 28 U.S.C. § 1446 and Local Rule 83.IV.01.

121.     WHEREFORE, Defendant removes this action to the United States District Court for the District of South Carolina, Greenwood Division.

**{SIGNATURE PAGE TO FOLLOW}**

**RICHARDSON PLOWDEN & ROBINSON, PA**

s/*Zachary B. Hayden*

William C. McDow [6359]
Zachary B. Hayden [12932]
1900 Barnwell St.
P.O. Drawer 7788
Columbia, SC  29202
(803) 771-4400
bmcdow@richardsonplowden.com
zhayden@richardsonplowden.com
*Attorneys for Defendants NHC HealthCare/Greenwood,*
*LLC and Jacob Shearer*

November 22, 2022